**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | Civ. No. 25-___1002___ |
| JEREMIAH PEACEMAKER, | * | |
| | * | |
|     Plaintiff, | * | |
| v. | * | |
| | * | |
| TIMOTHY TOOMEY, Former | * | **COMPLAINT** |
| Assistant Chief of Police and | * | |
| Current Chief of Police, in his | * | |
| official capacity and individually; | * | |
| LEE MCPEEK, Former Chief of | * | |
| Police of the Watertown Police | * | |
| Department, in his official capacity | * | |
| and individually; TERRY INGALLS, | * | |
| Former Detective of the Watertown | * | |
| Police Department, in his official | * | |
| capacity and individually; | * | |
| DETECTIVE CODY TRUMM, of the | * | |
| Watertown Police Department, in | * | |
| his official capacity and | * | |
| individually; DETECTIVE RUEBEN | * | |
| KINNUNEN, of the Watertown | * | |
| Police Department, in his official | * | |
| capacity and individually; FORMER | * | |
| DETECTIVE CHAD STAHL, | * | |
| formerly of the Watertown Police | * | |
| Department, in his official capacity | * | |
| and individually; OFFICER SHANE | * | |
| HARDIE, formerly of the Watertown | * | |
| Police Department and currently | * | |
| working for the Division of Criminal | * | |
| Investigations, in his official | * | |
| capacity (as an officer for the | * | |
| Watertown Police Department and | * | |
| Director of the Division of Criminal | * | |
| Investigations agent) and | * | |
| individually; OFFICER BRANDON | * | |
| JOHNSON, of the Watertown Police | * | |
| Department, in his official capacity | * | |
| and individually; OFFICER RYAN | * | |
| FISCHER, formerly of the | * | |

Watertown Police Department, in      *
his official capacity and      *
individually; OFFICER JAMON      *
HARBERTS, of the Watertown      *
Police Department, in his official      *
capacity and individually; OFFICER      *
TREVOR BARTHEL, of the      *
Watertown Police Department, in      *
his official capacity and      *
individually; OFFICER CADEN      *
WOLLSCHLAGER, of the      *
Watertown Police Department, in      *
his official capacity and      *
individually; OFFICER RYAN      *
BEAUCHAMP, of the Watertown      *
Police Department, in his official      *
capacity and individually; OFFICER      *
SCOTT PRICE, of the Watertown      *
Police Department, in his official      *
capacity and individually; EACH      *
SUPERVISOR OF ANY CURRENT      *
OR FORMER WATERTOWN      *
POLICE OFFICER NAMED      *
(unknown names), in their official      *
capacity and individually; AGENT      *
CAMERON COREY, formerly of the      *
South Dakota Division of Criminal      *
Investigation, in his official capacity      *
and individually; AGENT NATHAN      *
WINTER, of the South Dakota      *
Division of Criminal Investigation,      *
in his official capacity and      *
individually; AGENT DARIN      *
SINNER, of the South Dakota      *
Division of Criminal Investigation,      *
in his official capacity and      *
individually; AGENT JEFFREY      *
BELLON, of the South Dakota      *
Division of Criminal Investigation,      *
in his official capacity and      *
individually; AGENT JEFFREY      *
KOLLARS, of the South Dakota      *
Division of Criminal Investigation,      *
in his official capacity and      *
individually; AGENT JASON EVEN,      *

*Jeremiah Peacemaker v. Timothy Toomey et al*
*Complaint*
*Page 2 of 65*

of the South Dakota Division of    *
Criminal Investigation, in his    *
official capacity and individually;    *
AGENT SCOT HAWKS, of the South    *
Dakota Division of Criminal    *
Investigation, in his official capacity    *
and individually; DANIEL A.    *
SATTERLEE, in his official capacity    *
as Director of Division of Criminal    *
Investigation and individually;    *
ATTORNEY GENERAL MARTY    *
JACKLEY, as Supervisor of the    *
Division of Criminal Investigation    *
and South Dakota Forensic Lab,    *
and individually; JASON    *
RAVNSBORG, as Supervisor of the    *
Division of Criminal Investigation    *
and South Dakota Forensic Lab,    *
and individually; MARK VARGO, as    *
Supervisor of the Division of    *
Criminal Investigation and South    *
Dakota Forensic Lab, and    *
individually; FORENSIC SCIENTIST    *
HEATHER SPECHT, Formerly of    *
the South Dakota Forensic Lab, in    *
her official capacity and    *
individually; FORENSIC SCIENTIST    *
JESSIKA KIRKPATRICK, of the    *
South Dakota Forensic Lab, in her    *
official capacity and individually;    *
KRISTINA FRYER, Director of the    *
South Dakota Forensic Lab, in her    *
official capacity and individually;    *
and THE CITY OF WATERTOWN,    *
   *
     Defendants.    *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    *

The Plaintiff, Jeremiah Peacemaker, by and through his attorneys,

Steven C. Beardsley, Michael S. Beardsley, Conor P. Casey, Scott R. Bratland

and Kate M. Benson, for his Complaint, states and alleges as follows:

## A.  PARTIES

1.

Plaintiff, Jeremiah Peacemaker, is a resident of the State of South Dakota.

2.

Defendant Timothy Toomey was a sworn law enforcement officer formerly with the Watertown Police Department (WPD) and served as Police Chief and Assistant Chief during all relevant times.  He had executive and supervisory authority for the acts of WPD officers.  He resides in South Dakota.

3.

Defendant Lee McPeek was a sworn law enforcement officer formerly with the WPD and served as Police Chief and Assistant Chief during all relevant times.  He had executive and supervisory authority for the acts of WPD officers. He resides in South Dakota.

4.

Defendant Terry Ingalls was a sworn law enforcement officer formerly with the WPD.  He resides in South Dakota.

5.

Defendant Cody Trumm is a sworn law enforcement officer with the WPD.  He resides in South Dakota.

6.

Defendant Rueben Kinnunen is a sworn law enforcement officer with the WPD. At times relevant, he served as lead investigator on behalf of WPD. He resides in South Dakota.

7.

Defendant Chad Stahl is a sworn law enforcement officer formerly with the WPD. At times relevant, he served as lead investigator on behalf of WPD. He resides in South Dakota.

8.

Defendant Shane Hardie is a sworn law enforcement officer formerly with the WPD and currently with the Division of Criminal Investigations. He resides in South Dakota.

9.

Defendant Brandon Johnson is a sworn law enforcement officer with the WPD. He resides in South Dakota.

10.

Defendant Ryan Fischer was a sworn law enforcement officer formerly with the WPD. He resides in South Dakota.

11.

Defendant Jamon Harberts is a sworn law enforcement officer with the WPD. He resides in South Dakota.

12.

Defendant Trevor Barthel is a sworn law enforcement officer with the WPD.  He resides in South Dakota.

13.

Defendant Caden Wollschlager is a sworn law enforcement officer with the WPD.  He resides in South Dakota.

14.

Defendant Ryan Beauchamp is a sworn law enforcement officer with the WPD.  He resides in South Dakota.

15.

Defendant Scott Price is a sworn law enforcement officer with the WPD. He resides in South Dakota.

16.

Defendant Toomey's, Ingalls', Trumm's, Kinnunen's, Stahl's, Hardie's, Johnson's, Fischer's and Harbert's Supervisors, names unknown, are presumed to be sworn law enforcement officers with the WPD, residing in the State of South Dakota.

17.

Defendant Cameron Corey is a sworn law enforcement agent formerly with the South Dakota Division of Criminal Investigation (DCI).  At times relevant to the Complaint, he served as the lead investigator on behalf of DCI. He resides in South Dakota.

18.

Defendant Nathan Winter is a sworn law enforcement agent with the South Dakota DCI.  He resides in South Dakota.

19.

Defendant Darin Sinner is a sworn law enforcement agent with the South Dakota DCI.  At times relevant to the Complaint, he served as the lead investigator on behalf of DCI.  He resides in South Dakota.

20.

Defendant Jeffrey Bellon is a sworn law enforcement agent with the South Dakota DCI.  He resides in South Dakota.

21.

Defendant Jeffrey Kollars is a sworn law enforcement agent with the South Dakota DCI.  He resides in South Dakota.

22.

Defendant Jason Even is a sworn law enforcement agent with the South Dakota DCI.  He served as evidence custodian at the crime scene on behalf of DCI.  He resides in South Dakota.

23.

Defendant Scot Hawks is a sworn law enforcement agent with the South Dakota DCI.  He resides in South Dakota.

24.

Defendants Corey's, Winter's, Sinner's, Bellon's, Kollars' and Even's Supervisors, names unknown, are presumed to be sworn law enforcement agents with the South Dakota DCI, residing in the State of South Dakota.

25.

Defendant Daniel A. Satterlee is the Director of the South Dakota DCI. He has executive and supervisory authority over the DCI agents. He resides in South Dakota.

26.

Defendant Marty Jackley is the Attorney General for the State of South Dakota and the Supervisor of the DCI and South Dakota Forensic Lab (SDFL). He has executive and supervisory authority over the DCI agents and SDFL agents or analysts. He resides in Pierre, South Dakota.

27.

Defendant Jason Ravnsborg is the former Attorney General for the State of South Dakota and the Supervisor of the DCI and SDFL. He has executive and supervisory authority over the DCI agents and SDFL agents or analysts. He resides in South Dakota.

28.

Defendant Mark Vargo is the former Attorney General for the State of South Dakota and the Supervisor of the DCI and SDFL. He has executive and

supervisory authority over the DCI agents and SDFL agents or analysts.  He resides in South Dakota.

### 29.

Defendant Heather Specht is a former forensic scientist for the SDFL. She resides in North Dakota.

### 30.

Defendant Jessika Kirkpatrick is a forensic scientist for the SDFL.  She resides in South Dakota.

### 31.

Defendant Kristina Fryer is a forensic scientist and Director for the SDFL.  She has executive and supervisory authority over the SDFL employees. She resides in South Dakota.

### 32.

Defendant Codington County is a municipal entity organized under the laws of the State of South Dakota.  At all times relevant, Codington County employed a prosecutor who had executive and supervisory responsibility for the acts of the Codington County State's Attorney's office, agents, and/or employees.  The State's Attorney possessed final policy making and decisional authority within the Codington County State's Attorney's office and was responsible for policies, practices and customs of the State's Attorney's office, as well as hiring, screening, training, supervising, disciplining and control of the Deputy State's Attorneys in the office.  At all times material to this Complaint, Defendant Codington County, by and through its State's Attorney,

had, in effect, certain policies, practices and customs which were applied to the acquisition of evidence and the submittal of invalid or incomplete and false evidence used in the prosecution of the Plaintiff.

33.

The Defendant City of Watertown is a municipal entity organized under the laws of the State of South Dakota. At all times relevant, the City of Watertown had executive and supervisory responsibility for the acts of the WPD agents and/or employees. At all times material to this Complaint, Defendant City of Watertown, by and through its employees, had in effect certain explicit and de facto policies, practices and customs which were applied to the acquisition of evidence, and the submittal of invalid or incomplete evidence against the Plaintiff and used in the prosecution of the Plaintiff.

34.

Defendant Watertown Police Department (WPD) is an agency of the City of Watertown and was responsible for the training, supervision and discipline of WPD employees and/or agents, including each individually named Defendants that were employees or former employees of WPD. At all times material to this Complaint, the WPD, by and through its employees, had, in effect, certain explicit and de facto policies, practices and customs which were applied to the investigation of the case, the acquisition of evidence and the submittal of invalid, misleading, incomplete and false evidence against the Plaintiff and used against the prosecution of the Plaintiff.

35.

Defendant Division of Criminal Investigation (DCI) is an agency of the State of South Dakota and was responsible for the training, supervision and discipline of DCI employees and/or agents, including each individually named Defendants that were employees or former employees of DCI. At all times material to this Complaint, the DCI, by and through its employees, had, in effect, certain explicit and de facto policies, practices and customs which were applied to the investigation of the case, the acquisition of evidence and the submittal of invalid, misleading, incomplete and false evidence against the Plaintiff and used against the prosecution of the Plaintiff.

36.

Defendant South Dakota Forensic Lab (SDFL) is an agency of the State of South Dakota and was responsible for the training, supervision and discipline of SDFL employees and/or agents, including each individually named Defendants that were employees or former employees of SDFL. At all times material to this Complaint, the SDFL, by and through its employees, had, in effect, certain explicit and de facto policies, practices and customs which were applied to the investigation of the case, the acquisition of evidence and the submittal of invalid, misleading, incomplete and false evidence against the Plaintiff and used against the prosecution of the Plaintiff.

## B.  INTRODUCTION

37.

This is a civil rights action brought under 42 U.S.C. § 1983 for damages arising from Defendants' intentional, reckless, wanton, willful, malicious and negligent violation of the Plaintiff's civil and statutory rights, and the breach of duty of care owed to Plaintiff. Defendants engaged in actions that fell well below the standard of care in the performance of their duties under color of state law in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments of the U.S. Constitution.  As a proximate result of the policies and manner in which the Defendants conducted themselves, their employees and their investigations, the Plaintiff's home was searched, his body was photographed, and his DNA was collected without warrant, under false pretenses, and without lawful consent.  The Plaintiff was subjected to a brutal custodial interrogation for approximately eight hours behind closed doors under false pretenses and (for part of the time) without being read his Miranda Rights or being told the real reason he was being questioned.  At the conclusion of the interrogation (which did not result in a confession), the Plaintiff was arrested for murder without probable cause or warrant.  There were no eyewitnesses to the murder; Plaintiff had no motive; and no murder weapon was found.  There were numerous other suspects, each with more opportunity and motive than Plaintiff, but they were not investigated.

38.

The case was presented to a grand jury on September 14, 2020, and the key pieces of evidence used to obtain the indictments were fraudulent/false/misleading forensic reports.

39.

After Plaintiff's arrest, Defendants received substantial exculpatory evidence indicating that the Plaintiff was innocent (including statements from four people that came forward and told Defendants that they saw the victim alive four days after they were alleging the Plaintiff killed her). Defendants also obtained video footage showing the Plaintiff was alive on the date witnesses described seeing her, but that evidence was disregarded. Other exculpatory evidence was hidden, intentionally not documented or intentionally and wrongfully discredited by the intentional preparation of misleading and false police reports.

40.

Ultimately, Plaintiff was charged with first degree murder and sat 1,217 days in the Codington County Detention Center before a Codington County jury acquitted him of all charges. The Plaintiff suffered severe distress and sustained permanent damage to his reputation, emotional wellbeing, livelihood and relationships.

## C. JURISDICTION

41.

Jurisdiction is conferred by 28 U.S.C. § 1343, which provides for original jurisdiction of this Court and suits authorized under 42 U.S.C. § 1983, to redress the deprivation under color of state law, statute, ordinance, regulation, custom or usage of any right, privilege or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens and all persons within the jurisdiction of the United States.

43.

This is an action arising out of the laws of the United States, particularly Civil Rights Act, Title 42, and consequently, there is a federal question under 28 U.S.C. § 1331 and jurisdiction under § 28, § 1343 and § 1367.

## D. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

44.

Plaintiff was assaulted and hit by a car shortly after midnight on August 27, 2020.

45.

Plaintiff limped to the Codington County Detention Center, hoping law enforcement would help him. He was intoxicated and bleeding. He had a chipped tooth, a gash on his head and a busted cell phone. Bodycam footage shows that Defendant Caden Wollschlager took photos of his injuries and a statement from the Plaintiff, but that was the entire extent of the investigation into this felony hit and run and felony aggravated assault.

46.

Defendant Wollschlager's report regarding the crime against the Plaintiff landed on his supervisor, Defendant Stahl's, desk.

47.

Defendant Stahl thought Plaintiff was strange and that the crime he reported was "bizarre". Defendant Stahl assigned the investigation to Defendant Hardie because, "he had plenty of time on his hands."

48.

When Defendant Hardie was questioned about why he did not investigate the report, Hardie claimed he was simply too busy, and he did not know how to find Plaintiff. (This claim is blatantly false. They knew exactly where he lived and how to reach him. When they decided he was a murder suspect, they drove straight to his apartment, and he was home.)

49.

As a result of the hit and run, Plaintiff struggled with the emotional trauma. He was trying to get sober. He contacted an inpatient facility, Serenity Hills, for help. Plaintiff checked in at 11:40 on September 1, 2020, and remained there until September 2, 2020, at 3:45. He was provided a ride to the facility by law enforcement (because he had no car) and he was given a ride to his apartment (from Serenity Hills), to gather more personal belongings so he could return for a longer stay.

**SEPTEMBER 2, 2020**

50.

*Jeremiah Peacemaker v. Timothy Toomey et al*
*Complaint*
*Page 15 of 65*

On September 2, 2020, the body of Kendra Owen was found in her apartment by her case worker, Marciella Espinoza (Espinoza), from the Human Service Agency (HSA).  Ms. Owen was stabbed 16 times, and she was decapitated.  There was no evidence of sexual assault.

51.

Ms. Owen lived in a home located at 307½ North Broadway, just a couple of blocks from downtown Watertown.  The small home had been converted into three separate apartments.  There was a front apartment, a side apartment and a basement apartment.  Ms. Owen lived in the side apartment.

52.

Espinoza went to Owen's home twice on September 1.  The door was locked, and Ms. Owen's air conditioner was on.   She also went twice on September 2, 2020.  The first time on September 2 was at 2:38 P.M.  The door was locked, and nobody answered the door.  She could smell a foul odor and noticed that flies were swarming the entrance.  She was worried.  She checked back again at 6:00 P.M. on September 2.  This time, when she tried the door, it was unlocked.

53.

When Espinoza opened the door, she saw Ms. Owen's body on the floor.  Ms. Owen's severed head was propped up on a mattress beside the body.  She quickly exited the apartment and called 9-1-1.

54.

Minutes later, WPD officers arrived on scene.  It was determined that the DCI would process the crime scene and collect the evidence and the WPD would investigate the murder. Defendant Stahl was the lead investigator for WPD and Defendant Corey was in charge for DCI.

55.

Defendant Trumm was first on the scene.  He interviewed Espinoza and other caseworkers who showed up.  When Espinoza told him about being at the residence on four separate occasions over a two-day span and the door being locked and the air conditioner on, Trumm knew how vital this information was. It meant someone was in Owen's home between 2:38 P.M. and 6:00 P.M. on September 2, even though it was clear she had been dead for days.  Defendant Trumm immediately left the group and told Defendant Toomey (the Assistant Chief) and Defendant Stahl.

56.

Defendant Trumm was promptly dismissed by Defendant Stahl and Defendant Toomey.  Defendant Stahl said, 'well, she's been dead for days'.  As Defendant Stahl walked by the group of HSA counselors, Espinoza frantically tried to tell him what she saw, but Defendant Stahl ignored her.  This interaction is captured on video.

57.

Another critical witness arrived at the scene.  Her name was Jessica Modolo.  She was a census worker who also stopped at Ms. Owen's apartment at 1:34 on September 2.  She told WPD Defendants that, when she arrived, she

could smell a foul smell and saw the flies.  As she approached the apartment, she saw the blinds move.  She could also hear a TV on within Ms. Owen's apartment.  Modolo knew someone was in the apartment; but, when she knocked, no one answered.  She expected to write a statement, but she, too, was rebuffed by Defendant Stahl.

58.

WPD Defendants did not even document Ms. Modolo's name, phone number or the information she provided.  Consequently, she remained unknown to the Defense counsel until February 15, 2024, just two weeks before the trial.

59.

Both Espinoza's and Modolo's testimony were critical to the case.  Because Ms. Owen had been deceased for days, the odor within her apartment, due to her decomposition, was so overwhelming it caused a seasoned law enforcement officer to vomit.  If a person was in Ms. Owen's apartment on September 2, earlier in the day, as reported by Ms. Modolo and Ms. Espenoza, that person probably was the person who murdered Kendra Owen.  No other reasonable person would be hanging out in that tiny apartment with her decapitated body.

60.

This information was also critical in proving Plaintiff's innocence.  Plaintiff was at Serenity Hills from September 1, 2020 at 11:30 P.M. through

September 2, 2020 at 3:45 P.M.  He was not the person who was in Ms. Owen's apartment at 1:34 on September 2.

61.

The WPD Defendants secured the scene.  Defendant Beauchamp looked in Ms. Owen's apartment and ran to the neighbor's backyard to vomit.

62.

Defendant Reuben Kinnunen photographed the exterior of the home. Ms. Owen's home had a fenced-in backyard.  Defendant Kinnunen photographed a hammock-like tent hanging from a tree in her backyard.  There was also a couch, rug and a folded-up plastic tarp.

63.

Although Defendant Kinnunen photographed the exterior of the home, he failed to tell any other officers, including DCI (the people in charge of collecting evidence), about what he discovered in the backyard.  The tent, couch and the tarp were not collected as evidence.  In fact, no evidence from the back yard was collected.  There were several garbage cans depicted in Defendant Kinnunen's photographs of the back yard, but none of them were searched.  It was never determined who was living in Ms. Owen's backyard.

64.

Defendant Assistant Chief Toomey told the other officers he would be responsible for a perimeter search of Ms. Owen's home.  At trial, he explained to the jury the importance of the perimeter search.  He said he would be looking for "evidence, footprints, discarded items, those types of things."  At trial, Toomey

was surprised to learn that he had told officers he would do the perimeter search and agreed that his 'search' lasted all of 45 seconds.  He admitted that he did not go to the backyard, where it appeared that somebody was living in a tent/hammock.  He did not see the tarp.  Defendant Toomey's declaration that he would do the perimeter search and subsequent failure to follow through is also captured on video.  He only walked down the north side of the home and then got distracted and never finished the search.

65.

When Defendant Shane Hardie applied for a Search Warrant, he only requested permission to search Ms. Owen's apartment, not the entire house.  The other two apartments were not searched.  The other tenants were never interrogated.

66.

Two years after Ms. Owen's murder, a new tenant in the front apartment reached out to Defense counsel to report finding disturbing reddish-brown stains on the hard wood floors of the front apartment.  A Defense investigator photographed the large reddish-brown stains that were present in the front apartment.  It was not possible to determine if the stains were related to Ms. Owen's murder because that apartment was not searched when her body was found.

67.

Three dead bodies (including Ms. Owen's) had been found in that same house within five years.  One was found before Ms. Owen's death and one after. Yet, Defendants did no investigation to determine if there was a correlation.

68.

After the Search Warrant was issued, DCI took a video of Ms. Owen's apartment.  However, they, too, failed to video the perimeter of the house, again missing the evidence in the backyard.

69.

Defendant Corey spoke with Defendant Stahl when he arrived on scene to process the crime scene but because Defendant Stahl had dismissed the information regarding the door being locked and then unlocked and the TV being on, he never shared that information with Defendant Corey.  This evidence was crucial as it confirmed there was no forced entry, and somebody had a key or was willingly let into Kendra's apartment.  It also would have given Defendant DCI important information regarding where to search for fingerprints or DNA.  None of the DCI agents, charged with collecting evidence, were aware of this because Defendant Stahl failed to tell them.

70.

Defendant DCI agents collected evidence and processed the grizzly crime scene.  The apartment was small, hot, smelly, and full of blow flies.

71.

Defendants failed to request the assistance of a forensic scientist at the crime scene and decided to process the scene themselves.  As the agents collected evidence, important policies and procedures fell by the wayside.  Key evidence was not collected and is lost forever.

72.

Each piece of evidence should be collected and packaged individually. However, Defendant Winters packaged three bandages and a tissue in one evidence bag.

73.

Evidence is not supposed to be packaged wet.  Yet, the three bandages and the tissue were so wet that when the evidence arrived in Pierre at the State Crime Lab on October 9, 2020 (over a month later), they were leaking through the paper bag.  It was noted by the crime lab that, "Some of the contents of the bandages soaked through the brown paper bag."

74.

The paper bag that was wet and leaking was transported from Watertown to Pierre by Defendant Kinnunen who should have noticed it was leaking. Even worse, it was transported with another brown paper bag containing Plaintiff's black hooded sweatshirt.  The contents of that leaking paper bag were bandages that tested positive for possible blood and Ms. Owen's DNA.

75.

Because Defendants did not call any forensic scientists to assist with evidence collection at the crime scene, they were unable to collect any forensic evidence from the walls of the small apartment (DNA or fingerprints) or any evidence from any fixtures from the apartment. DCI only collected 31 pieces of evidence from the entire crime scene.

76.

Of the evidence collected, very few items were tested, even though this was a brutal body on body crime. This was the kind of crime where forensic evidence could be present. Yet, DCI Defendants did not even test the victim's clothes, keys, eyeglasses, purse, blankets or the peculiar gray stocking hat with reddish-brown stains that were on or adjacent to the victim's body.

77.

Although Defendant DCI agents each testified that it is their policy to wear clean gloves when collecting evidence, at trial DCI Agent Even admitted that their own evidence collection log had a bloody fingerprint on it.

78.

It took four officers to load Ms. Owen's body into the evidence bag. It was described as a "messy process" due to the state of her decomposition. DCI Defendants testified that they got Ms. Owen's bodily substances on their bodies. Loading the body was one of the last things they did at Ms. Owen's residence. The investigators left her residence at 1:23 A.M. and then went right into Mr. Peacemaker's residence to collect evidence at 1:30 A.M.

79.

In preparation for trial, the Defense team returned to the crime scene in August of 2023. While walking around the home, they saw something strange on the roof of the house. It was a saw. They went and reviewed the scene photographs taken on September 2, 2020, and found proof that the saw was present on the roof on the day Ms. Owen's body was discovered, but Defendants did not find it because they did not look. It remained on the roof for three years. By the time it was finally collected, the forensic evidence was gone.

80.

There were also reddish-brown stains present on the roof where the saw was located.

81.

Ms. Owen's apartment appeared to have two beds made up on the living room floor (her apartment did not have a bedroom). Yet, law enforcement did not question any of Ms. Owen's friends or family to find out who was living or staying with Ms. Owen. Men's boxer brief underwear was found in a backpack on one of the beds, but law enforcement did not determine who they belonged to.

82.

Defendant Sinner took over as lead Agent for DCI after Agent Corey was promoted. He testified that he became the point of contact from the DCI perspective. However, he acknowledged, at trial, that he never reviewed the file

at all, relying on information from hallway chatter and occasional stories on the news about the case.

83.

While DCI continued to gather evidence within the home, Defendant Stahl was getting restless outside of the home. He had a hunch. He remembered seeing the report that Plaintiff made about the assault and hit and run. Due to the "bizarre" nature of the report made by the Plaintiff six days before, Defendant Stahl decided Mr. Peacemaker was the prime suspect in this case.

84.

Defendant Stahl gathered Defendant Trumm and Defendant Fischer, and they concocted a scheme to get into Plaintiff's apartment. They left the crime scene and agreed they would pretend like they were investigating the crime he reported. They wanted to trick Plaintiff into providing evidence about Ms. Owen's murder.

**SEPTEMBER 2, 2020 AND SEPTEMBER 3, 2020 –
ARRESTED WITHOUT PROBABLE CAUSE**

85.

When Defendant Stahl, Defendant Fisher and Defendant Trumm arrived at Mr. Peacemaker's apartment, they scoured the outside and inside of the complex looking for evidence of murder. They found none.

86.

Without any reasonable suspicion, probable cause or warrant, they knocked at the door to Plaintiff's apartment at 9:45 p.m. The officers led Plaintiff to believe they were finally investigating the crime that he had reported. He let them in. He gave them several pieces of clothing and invited them to go through his things. He also gave them his cell phones (the broken one from the assault and a different phone that was working).

87.

Then, Defendant Stahl, Fisher and Trumm asked the Plaintiff to come down to the police department to discuss the crime he had reported. He agreed.

88.

Upon Plaintiff's arrival at the police department, he was placed in an interrogation room, and he was asked to provide a DNA sample. He was told it was necessary because they might be able to find his DNA on the car that hit him. They also photographed his healing injuries. Again, Plaintiff complied.

89.

Defendant Stahl had Plaintiff sit down to "talk".  The talk quickly became an interrogation.  Defendant Stahl first questioned him about the hit and run and assault.  Then, Defendant Stahl asked the Plaintiff if he had met any girls lately or had any "hook ups".  Plaintiff told Defendant Stahl that he has not had any hook ups, but that he did meet a girl at his friend's apartment a couple of weeks ago.  Defendant Stahl asked Mr. Peacemaker about her hair style.  Plaintiff recalled that she had pink hair.  That piqued Defendant Stahl's interest.  Ms. Owen had pink hair.

90.

Detective Stahl tried, for hours, to convince Plaintiff that he met the girl with pink hair on the same day that he reported the assault.  Plaintiff repeatedly corrected him, explaining that he met the girl days prior to the hit and run.

91.

Eventually, Detective Stahl read Plaintiff his Miranda Rights.

92.

Then, Defendant Stahl slapped a picture of Ms. Owen's dead body and severed head on the table in front of the Plaintiff.  He was completely blindsided and stunned.  Defendant Stahl accused Plaintiff of killing Ms. Owen. He called him a psychopath and a serial killer.

93.

Plaintiff repeatedly tried to tell Detective Stahl that he had only met Ms. Owen one time, and he liked her.  He said that she was nice to him.  Plaintiff

explained that he was not trying to hook up with her and that she did not make him mad. He was happy to meet her and to have made a new friend.

94.

Plaintiff explained, in detail, what happened the night he met Ms. Owen. He walked across the hall to Clinton Reid's apartment. Reid, Vernon Driver and Ms. Owen were drinking beer and invited him to join. He agreed. It was the first time he had ever met Ms. Owen. When the alcohol ran out, Ms. Owen wanted to go down to the bar. Plaintiff wanted to buy some off-sale beer. They walked down to Doc's bar together. Ms. Owen stayed at the bar, and Plaintiff bought beer and went back to his apartment.

95.

Later, Plaintiff walked back downtown. The bars had closed, but he saw Ms. Owen outside of Doc's bar talking to two unidentified Native American men. She waved him over to join them. They talked for about a half hour, and then Ms. Owen and Plaintiff left and walked to her apartment so he could use the bathroom. Plaintiff explained that he did use the bathroom, and they listened to music for about 20 minutes. Then, he left and went home. Plaintiff told Defendant Stahl that was the only time he was ever with Ms. Owen, and he had not seen her since.

96.

Plaintiff begged Defendant Stahl to find video evidence from the bar where he talked to Ms. Owen. Ultimately, Defendant Stahl did find video evidence from Doc's bar. The video depicted exactly what Plaintiff had

described to Stahl.  Defendant Stahl also was able to confirm that Plaintiff was telling the truth about how he met Ms. Owen from talking to the people at the apartment across the hall.  The night Plaintiff met Ms. Owen was two days prior to the hit and run.  He met her at Reid's apartment later in the evening of August 23, 2020.  Peacemaker and Owen left Doc's bar and walked to her apartment on August 24, 2020.

97.

Defendant Stahl told Plaintiff that they had the neighbor's video surveillance that would show everyone coming and going from her residence. Plaintiff was relieved.  He said, good it will show me leaving and someone else entering.

98.

That same neighbor called the police to report that he had video evidence of people entering the crime scene tape after Ms. Owen's body was found. Defendant Jamon Harberts talked to the neighbor but did not collect the video evidence.

99.

Defendant Stahl did collect the neighbor's video footage, but he lost it.  It showed seven days of people coming and going from the residence.  WPD officers went back to the neighbor three years later to try to collect it again, but she only had kept one of the videos.

100.

During the eight-hour, all-night interrogation, Peacemaker's story remained consistent.  There was no confession or admission of guilt.

101.

Regardless, around 6:00 A.M. on September 3, 2000, Defendant Stahl arrested Plaintiff for the murder of Kendra Owen.  He had no arrest warrant.

102.

No reasonable law enforcement officer could have believed there was probable cause to make that arrest.  The only evidence that they had to arrest Mr. Peacemaker was his own statement that he had met Ms. Owen on August 23rd/24th.

103.

When questioned about the trickery used to get into Plaintiff's apartment and interrogate him, Defendant Stahl testified that he has never lied or tricked anyone to enter their residence without a warrant, but this was just one of his tactics.  Defendant Fisher testified that, before this, he had never in his career lied or tricked someone to get physical evidence from them, like photographs and DNA.

**CONFIRMATION PEACEMAKER WAS A VICTIM OF ASSAULT/HIT AND RUN**

104.

On September 3, 2020, after Plaintiff's arrest, WPD Defendants finally decided to investigate the hit and run that the Plaintiff reported.  At that time, their theory was that Peacemaker killed Ms. Owen on August 27, and then he

walked to the jail as some sort of coverup.  They wanted to prove that Plaintiff made up the story about the assault and hit and run.  When they actually did an investigation, what they discovered is that he had told the truth.

105.

Defendant Hardie called Dempsey's bar on September 3, 2020, to see if anyone saw a fight on August 27, 2020.  Miraculously, one of the bartenders did.  He described it as "the weird karate kick" fight.  That was exactly how Plaintiff described it (he claimed he got karate kicked in the head).  Although, he did not see the car that hit the Plaintiff.  He saw the individuals jump into the car, and he saw the car speed off at a high rate of speed, jumping the curb, without lights on.

106.

Despite their theory of the case crumbling the same day the Plaintiff was arrested, investigators refused to consider the possibility that they had arrested the wrong person.  Neither the Chief, nor Assistant Chief, supervised Defendant Stahl.  At trial, Defendant Toomey testified that he relied entirely on Defendant Stahl for the investigation, 'I trust Chad Stahl to do a good job.'

107.

Defendant Toomey, along with every officer that was questioned at trial, struggled to remember any debriefings or meetings regarding this investigation of this crime.

108.

They arrested Plaintiff so no further investigation was needed. Defendant Fischer testified that they do not investigate a case after an arrest.

109.

Defendant Stahl remained in charge until he received a promotion and then later retired from the force in 2023.

110.

On September 3, 2020, the police conducted a live media briefing to announce the arrest of Mr. Peacemaker. They asked for the public's help with the timeline. They asked individuals who had seen Ms. Owen recently to contact law enforcement. They did not mention that they were looking for the murder weapon or the victim's cell phone.

111.

Immediately, witnesses started coming forward with reports of seeing Ms. Owen on August 28, 2020. Mark Dean and Candace Strickland reported that they saw Kendra Owen on August 28, 2020. She was walking toward the hotdog feed at Plains Commerce Bank. This was problematic evidence for law enforcement because they now believed (and would argue at trial) that Plaintiff killed Ms. Owen on August 24, 2020.

112.

When Defense attorneys received the police reports documenting the witness statements, the video recordings from Plains Commerce Bank were subpoenaed. Sure enough, there was a woman, who fit Kendra Owen's description with pink hair, depicted on the Plains Commerce Bank video on

August 28, 2020.   Detective Stahl, despite the witness evidence and the video, dismissed it and issued a report saying that the video depicted a "Caucasian woman".  Defendant Stahl did nothing to try to figure out whose car Ms. Owen got into or who she was with, even though those may have been the last people to see her alive.

113.

In addition to Dean and Strickland, a young man named Gavin Lindner came to the Police Department and reported to Defendant Kinnunen that he also saw Kendra Owen on August 28, 2020.  Lindner knew Kendra Owen well. She lived with his family as a foster child.  Defendant Kinnunen told Lindner that it could not have been Ms. Owen that he saw because she would have had to have been dead by that day.  Detective Kinnunen did not even make a police report about the Lindner report until almost three years later, July 2023, when his new supervisor made him because the case was going to trial.

114.

Carla Willete was interviewed by Defendant Ingalls after Dean and Strickland reported that they saw Willet with Ms. Owen on August 28th. Defendant Ingalls carefully crafted a police report that indicated that Willette did not go to the hotdog feed with Owen.  Yet, when Willete testified at trial she

acknowledged that although she did not go to the hotdog feed with Owen, she did talk to her there.

115.

Defendant Ingalls crafted other police reports with similar tactics. For instance, he talked to a tenant that lived in Peacemaker's building named Paul Endres. He intentionally did not record his interview with Endres (or any of the other people he talked to). Then, he created a report to make it look like the information Endres gave him pointed to Plaintiff being guilty. When Mr. Endres' name was brought up in court and ended up in the press, he was furious. Mr. Endres' contacted Defense counsel by social media mid-trial to report that he never made any comments to Ingalls about whether the Plaintiff was guilty and that he always thought Plaintiff was wrongfully accused and seemed to be a nice guy.

**FAILURE TO INVESTIGATE OTHER SUSPECTS**

116.

Despite major flaws in their theory of the case, law enforcement refused to consider other suspects.

117.

Ms. Owen lived a high-risk lifestyle. She had a developmental disability, which impaired her judgment. According to her friends and HSA case workers, she also had a substance abuse disorder (alcohol). Ms. Owen also was known to be independent and a fighter. Her caseworker, Espinoza, nicknamed her

"Mike Tyson" because her initials were KO, and she was frequently involved in physical altercations.  Sometimes, Ms. Owen would be the assailant, and she was frequently the victim of violence.

### 118.

Ms. Owen would regularly allow intoxicated people into her home, which was located only a couple of blocks from the downtown bars.  From January 1, 2020, until her body was found, she called 9-1-1 six times.  Usually, because she needed assistance with removing people from her home.  The neighbors testified that there were people coming and going from her home at all hours of the night.  A quick search of Ms. Owen's record yielded a ton of potential suspects.  The 9-1-1 records had the names of individuals who should have been interviewed because they were recently in altercations with Ms. Owen, but they were not.

### 119.

None of these possible suspects/witnesses were brought into the police department for interrogation.  Potential evidence was lost forever.  Two key witnesses and two possible suspects are now dead.  The only person who was interrogated was Mr. Peacemaker.

120.

Each of these suspects had more motive and opportunity to commit this murder than the Plaintiff. Law enforcement ignored them all. Here is just a partial suspect list:

- A convicted felon, who had previously assaulted and threatened to kill Ms. Owen. Ms. Owen had a protection order against this person that had expired shortly before her death. Ms. Owen was worried this person would kill her. She even called 9-1-1 because she was worried about the protection order expiring. This individual was a former roommate and is believed to have taken Ms. Owen's keys. A cigarette, the same brand this individual smoked, is depicted in crime scene photos but Defendants failed to collect it.

- A convicted felon, whose DNA was found on a cigarette butt located on the living room floor where Ms. Owen's body was found. This suspect spent time in prison for solicitation of murder. She tried to hire an undercover FBI agent to kill a man. When asked what she would do to help with the murder, she offered to cut up the body. This woman was known to be staying with Owen around the time of her death.

- A convicted felon, who made the last nine phone calls to Ms. Owen's phone. He admitted to stopping at her home numerous times, looking for Ms. Owen during the timeframe when Ms. Owen was

murdered to retrieve his jean jacket.  Ms. Owen was wearing a jean jacket at the time of her death that was pulled off of her arm.

- A convicted felon, who allegedly broke Ms. Owen's arm in June of 2020.  Ms. Owen's caseworker saw this man with Ms. Owen at the bar on August 22, 2020.  He was also likely with Ms. Owen on August 15, 2020, when Ms. Owen called 9-1-1 and reported being "beat down".  He lied to Defendants about the last time he saw Ms. Owen. He is now deceased.

- A convicted felon that was one of the last people to see Ms. Owen alive and was present when Peacemaker met Owen.  He is now deceased.

- Ms. Owen's on-again/off-again boyfriend for six years.

- A convicted felon, who was using meth and, reportedly, hanging out with Ms. Owen around the time of her death.  This individual has a long history of committing violent assaults, including gauging out a victim's eye.

- A convicted felon, who was married to a woman that had previously assaulted Ms. Owen.  He made a strange phone call to Plaintiff while he was in jail claiming that people who killed Ms. Owen were now after him.

## BRADY VIOLATION

121.

During trial preparation, three days before the trial, the Defense learned that WPD showed photographs of five to seven Native American suspects to the HSA workers at the crime scene on September 2, 2020. Although law enforcement believed that these men were legitimate suspects in the murder of Kendra Owen, no report was ever generated by the WPD reporting who these men were and why they were suspects. When questioned on the subject at trial, officers denied showing the photographs. Yet, several HSA employees testified, under oath, they were shown photographs of suspects on a laptop.

122.

From September 2, 2020, through today, the WPD and DCI have continued to ignore real suspects in this case. People have come forward with evidence and the Defense has shared additional leads. This is a clear attempt to let the narrative continue, that despite being found not guilty, the Plaintiff probably committed the murder. Their past and continued breach of duty to investigate continues to cause emotional distress to Plaintiff.

123.

Since the trial, there has been a lot of backlash against WPD. Defendant Toomey did a press interview on February 15, 2025, where he said, "Guilty people get acquitted in a trial all the time. I wanted to shine some light on that. Just because somebody might be acquitted or a charge might be dismissed doesn't mean we were doing shoddy police work."

124.

Plaintiff gave law enforcement both of his phones, one broken one (from the night he was brutally assaulted) and another one. Defendant Hardie sent the broken phone to the United States Secret Service on September 7, 2020. He did not follow up with that request until April 6, 2023. Eventually, Defendant Hardie asked a defense attorney if he could get the passcode for the phone from Plaintiff. Plaintiff provided the passcode granting access. Mr. Peacemaker's phone data showed he had never called or texted Ms. Owen.

125.

The reports regarding her phone records were constantly changing. For instance, Defendant Toomey asked his staff to contact Ms. Owen's cell phone provider to ping her phone to identify its location. He testified that Verizon reported that her phone was last used on August 22, 2020. Defendant Hardie was directed to get Ms. Owen's phone data. Defendant Hardie testified that his first report showed that the phone was last used at 9:37 P.M. on August 23, 2020. Then, Defendant Hardie's second report said it was last used on August 24, 2020 at 2:27 A.M. Finally, his third report said it was last used on August 24, 2020 at 3:27 A.M. Defendant Hardie also testified about her call history. He acknowledged that the number searched was not Ms. Owen's number and that the digits were transposed.

126.

Key pieces of evidence were recklessly ignored. Evidence proving Mr. Peacemaker was innocent was lost, not collected, not tested and not

documented.    Defendants' reckless or purposeful misconduct shocks the conscience.

## FORENSIC EVIDENCE - CIGARETTE BUTTS

### 127.

Evidence was collected at the scene by DCI Defendants.  DCI was solely responsible for determining what was collected and then what was tested.  Obvious evidence was ignored.  Cigarette butts were found on the floor of Ms. Owens' residence near her body.  Only after a Defense request, were both butts tested.

### 128.

One cigarette butt came back with DNA from a female and the DNA did not belong to Ms. Owen.  Yet, Defendant Kristina Fryer of SDFL, relying on information from Defendant Kinnunen, refused to enter the DNA into the national CODIS database.  This database stores the DNA of felons nationwide.

### 129.

At a pre-trial hearing regarding the CODIS issue, Defendant Fryer testified falsely that the cigarette butt did not meet the criteria and that if the DNA was entered, that DNA would remain in the system.

### 130.

After a pre-trial hearing, the Court Ordered the State and SDFL to run the CODIS search.  There was a CODIS hit on the DNA; but, instead of immediately turning over the results to the Defense, the State sat on the

results for a week in order to send Defendant Sinner to conduct a quick interview with the potential suspect and prove she could not have committed the crime.

### 131.

The CODIS hit proved the DNA came from Brianna Lawrence, who had spent time in prison for Solicitation of Murder. A crime where she tried to hire a hit man to kill the father of their children. She planned to assist the hit man by chopping the body into pieces.

### 132.

Because this evidence was not put through CODIS in a timely manner, Ms. Lawrence was not interviewed for almost three years after the murder. The delay made it difficult to document Ms. Lawrence's location at the time of the murder.

### 133.

Ms. Lawrence was interviewed by Defendant Sinner. But she was not interrogated like a suspect. In fact, Defendant Sinner testified he tried for weeks to prove that she could not have committed the murder but was unable to do so.

**TOOTHPASTE TUBE/FINGERPRINT**

### 134.

DCI agents determined what evidence would be tested at the State Crime Lab. One of the first items tested for fingerprints, PHTH (possible blood) and

DNA was the toothpaste tube that was found in Ms. Owen's bathroom adjacent to used bandages.  It had an obvious reddish-brown stain on it.

135.

After testing was conducted on the toothpaste tube, Defendant Specht issued lab report No. 20-1169.1 and signed it under oath.  In the relevant part, the report states, "Examination of Item 3 (toothpaste tube) revealed one latent fingerprint <u>comprised of blood</u>, marked 1 suitable for comparison and identification purposes."  Later, the report states that the fingerprint marked 1 matched the right thumb print of Jeremiah Peacemaker.

136.

The report did not identify the location of the fingerprint causing DCI Defendants and WPD Defendants to believe the fingerprint was located in the reddish-brown substance.  But it was not.  It was in a different location on the tube and was invisible to the naked eye.

137.

Contrary to what she put in her lab report, at trial Defendant Specht admitted that the substance comprising the fingerprint was never tested (a stain adjacent to the fingerprint was tested).  The forensic examiner did <u>not</u> swab nor test the substance that the fingerprint was "comprised of".  At trial, she acknowledged that the statement she used in the lab report was false.

138.

SDFL has a policy forbidding scientists to swab for DNA or the PHTH test within the ridge detail of fingerprints, so as not to destroy the prints.

139.

Despite this policy, Defendant SDFL's recommended canned language for a fingerprint report is "comprised of blood." This language is intentionally misleading, fraudulent, and carefully crafted to overstate the test results.

140.

The tests used by the SDFL to determine the possible presence of blood are merely "screening tests," according to their own policy manual. If a substance tests positive on a screening test, it only means that it might be blood, it does not mean that it is blood. It is both misleading and a violation of the lab's own policy to refer to the substance as "blood" in a forensic report. Yet, reference to "blood" is recommended in the SDFL's canned language. This is intentionally misleading, fraudulent, and carefully crafted to overstate the test results.

141.

At trial, Defendant Specht admitted that it was also not accurate for her to refer to the substance as "blood" in lab report 20-1168.1 because only a screening test (known for false positive results for other bodily fluids, like saliva, urine, sweat and even peroxide) was conducted.

142.

The SDFL's policy manual requires the scientists to write reports that are clear and unambiguous. However, when describing the test results for the possible presence of blood, the PHTH test, the canned language required by SDFL is "the presence of blood is indicated by visual and chemical tests." This

is intentionally misleading. The language is carefully crafted to hide the testing method (because it is known for false results) and to overstate the test results.

143.

The other test by Defendant SDFL to determine whether blood is possibly present is the Hematrace test. This test is slightly better than the PHTH test because it can differentiate between animal and human blood. However, like the PHTH test, it is also known for false positive results. The canned language promoted by SDFL when there is a positive Hematrace test is "the presence of human blood was indicated". The language is carefully crafted to hide the testing method (because it is known for false results) and to overstate the test results.

144.

The false, misleading and overstated lab reports were presented to the grand jury and used against the Plaintiff at trial.

145.

Defendant Specht admitted that she became aware of the problems with her lab report in advance of trial. She acknowledged that she could have updated the report to make it clearer for the reader but did not. Defendant Specht intentionally chose not to amend the report and instead allow the false report to be submitted to the jury.

146.

Because the lab reports did not state the method of testing used for the determination of the presence of blood, Defense counsel wrote a letter asking

for clarification regarding what chemical or visual tests were done and the response from Defendant Kirkpatrick was a chemical and visual test, again intentionally hiding the names of the testing methods.

147.

PHTH and Hematrace are called "presumptive tests" because they are widely known for their false positive results for many other substances such as semen, sweat, saliva, vaginal fluid, rust, or peroxide.  A positive test result from the PHTH test, or Hematrace test, should never permit any reasonable scientist to report that the "presence of blood is indicated" or testify that a substance is "blood."  Yet, that is what Defendant Kirkpatrick did in this case.

148.

Defendant Kirkpatrick failed to document where she swabbed on the toothpaste tube (although she acknowledged it was not in the fingerprint) or the sweatshirt.  With regard to the tube, she testified twice about this issue and each time the location where she said she swabbed changed.

149.

Defendant Kirkpatrick tested the sweatshirt on three different dates, March 22, 2020 (PHTH), August 31, 2021 (DNA) and August 14, 2023 (Hematrace).  At trial, she testified falsely and with the intention to mislead the jury that she could combine the test results of those three tests and use her expert scientific opinion to determine that Ms. Owen's blood was located on Plaintiff's sweatshirt.  No reasonable forensic scientist could come to that conclusion.

## ENTOMOLOGY

150.

Time of death was a critical element in this case.  Law enforcement collected an 'Entomology Kit', which is used to determine time of death.  Dr. Randall testified that murder cases in South Dakota have been solved by the use of entomologists.  For reasons unknown, the 'Entomology Kit' was never sent to an entomologist.  The State's Pathologist was never even informed that an Entomologist Kit was collected.

## FAILURE TO COMMUNICATE

151.

There was a complete lack of communication between the WPD, DCI and SDFL.  The lack of communication was so abhorrent that the lead DCI Agent Defendant Corey still believed that the hit and run crime that was reported by Plaintiff was fabricated at the time Defendant Corey testified at trial, when WPD had been aware that the reported crime was legitimate since September 3, 2020.  Defendant Corey was the one deciding what evidence should be tested.

152.

Defendant Kirkpatrick was supposed to be swabbing for DNA near the fingerprint, but she did not know where the fingerprint was located (because it was invisible).  She mistakenly believed it was in the reddish-brown stain.

153.

Investigators were more worried, tiptoeing around each other's egos, than doing a proper investigation.  Defendant Corey testified, "So one of the things

that the DCI and the Attorney General's office does is we do not come into an agency and big foot a case." "Law enforcement we're proud individuals."

154.

WPD Defendants and DCI Defendants appeared stumped when asked how many meetings were held to discuss the status of the investigation of this case, because there were not any.

155.

Because of the quick arrest of Mr. Peacemaker and subsequent press releases, the public was led to believe that this was an open and shut case. Law enforcement officers were hailed as heroes for the quick arrest. The victim's family had no idea how flawed the case was until they showed up to watch the trial.

156.

In jail, Plaintiff could trust no one. Ms. Owen was well known, and she had a lot of friends and family. Plaintiff was in constant fear for his safety.

157.

The eight-day trial was grueling. Plaintiff was threatened in court. One day, he was taunted to "look at her Jeremiah", when a photo of her decapitated body was shown to the jury. He was forced to wear 'stun cuffs', which act like a shock collar in the event he would be unruly in the courtroom. He never was.

## VIOLATION OF COURT ORDER

### 158.

The court signed an Order directing that Plaintiff wear plain clothes in front of the jury.  However, when they brought him to court from the jail for the verdict, he was paraded in front of a full courtroom of spectators and jurors in stripes, cuffs and shackles.

### 159.

When the jury issued their verdict, it was complete mayhem in the courtroom.  The courtroom was full of people screaming threats of violence and street justice toward the Plaintiff.

### 160.

When Mr. Peacemaker was released from jail after three and one-half years, he had nowhere to go.  He had no money and no home.  He was completely traumatized by this entire process.  The threats to his safety are very real and still problematic.  Everywhere he goes, he fears that someone might recognize him.

## COUNT ONE

## 42 U.S.C. § 1983 FOR MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

### 161.

Plaintiff adopts by reference all prior and subsequent factual allegations of this Complaint.

### 162.

Defendants, for purposes of this Count are all law enforcement officers for the Watertown Police Department, Division of Criminal Investigations, and Forensic Scientists of the State of South Dakota, individually and not in their official capacity, acting under color of state law, deliberately arrested the Plaintiff on September 3, 2020 without probable cause in violation of his constitutional rights.

163.

No reasonable officer could have believed there was probable cause to arrest the Plaintiff.

164.

The Plaintiff was arrested 12 hours after Ms. Owen's body was found.  At the time of his arrest, the murder had not been investigated.  There were no eyewitnesses, no evidence had been tested, and law enforcement did not even know when Ms. Owen died.

165.

Plaintiff's arrest was based on Detective Stahl's hunch and Plaintiff's acknowledgement that he met Ms. Owen on one occasion on August 24, 2020.

166.

Plaintiff's case was presented to a grand jury on September 14, 2020, where the key piece of evidence was Defendant Specht's lab report dated September 4, 2020 that at trial she admitted contained the false statement that Plaintiff's fingerprint "comprised of blood" was found on a toothpaste tube located in Ms. Owen's bathroom.  This testimony involves the promotion of

fabricated forensic evidence; such misconduct directly caused the prosecution and subsequent harm to Plaintiff.

167.

Another grand jury proceeding was held on February 8, 2021, and Plaintiff was indicted the same day.  Notwithstanding the presumption of probable cause established by the grand jury indictment, fabricated forensic evidence and testimony, fraud, perjury and bad faith by law enforcement properly rebuts such presumption.

168.

The Plaintiff was found not guilty of all charges, which included First Degree Murder, Second Degree Murder, and First-Degree Manslaughter.

169.

Plaintiff was held against his will in the Codington County Detention Center from September 3, 2020, until he was acquitted on March 5, 2024.

170.

The instigation and continuation of these proceedings against the Plaintiff were primarily a result of an improper purpose, unjustifiable motive, hostility or ill will, and malice and were aimed to deprive the Defendant of his constitutional rights.

171.

The Plaintiff was damaged as a result of false arrest, false imprisonment and malicious prosecution and deprivation of his constitutional rights.

172.

The violation of Plaintiff's constitutional rights caused damage to the Plaintiff.

173.

Defendants' conduct is the proximate cause to the damage suffered by the Plaintiff.

174.

Defendants acted with malice to deprive Plaintiff of his constitutional rights entitling Plaintiff to punitive damages.

## COUNT TWO

### 42 U.S.C. § 1983 FOR USE OF UNRELIABLE AND FRAUDULENT INVESTIGATIVE TECHNIQUES, PROCUREMENT OF UNRELIABLE AND FABRICATED EVIDENCE AND SPOILATION OF EVIDENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

175.

Plaintiff adopts by reference all prior and subsequent factual allegations of this Complaint.

176.

Defendants, for purposes of this Count are all law enforcement officers for the Watertown Police Department, Division of Criminal Investigations, and Forensic Scientists of the State of South Dakota, individually and not in their official capacity, acting under color of state law, failed to properly investigate this matter and their failures were intentional and reckless, thereby shocking the conscience.

177.

Defendants' inadequate and reckless investigation, to include spoilation of exculpatory evidence, deprived Plaintiff of his substantive due process rights and his liberty interest in fair criminal proceedings. The violation of Plaintiff's constitutional rights caused damage to the Plaintiff.

178.

Defendants' conduct is the proximate cause to the damage suffered by the Plaintiff.

179.

Defendants acted with malice to deprive Plaintiff of his constitutional rights entitling Plaintiff to punitive damages.

**COUNT THREE**

## 42 U.S.C. § 1983 FOR DELIBERATE SUPPRESSION OF EXCULPATORY EVIDENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

180.

Plaintiff adopts by reference all prior and subsequent factual allegations of this Complaint.

181.

Defendants, for purposes of this Count are all law enforcement officers for the Watertown Police Department, Division of Criminal Investigations, and Forensic Scientists of the State of South Dakota, individually and not in their official capacity, acting under color of state law, deprived the Plaintiff of his right to be privy to exculpatory evidence.

182.

Defendants had a list of possible suspects and showed photographs of these possible suspects to Ms. Owen's case workers on September 2, 2020.

183.

Defendants did not provide the Plaintiff or Plaintiff's counsel with information regarding these potential suspects.

184.

At trial, Defendants denied showing photographs of potential suspects to Ms. Owen's case workers.

185.

In addition, Defendants deliberately withheld information regarding Gavin Lindner's statement that he saw Ms. Owen alive on August 28, 2020. Defendants took Lindner's statement in September of 2020, but they did not disclose this information to Plaintiff's counsel until July 27, 2023.

186.

This suppressed evidence was favorable to the Plaintiff.

187.

Suppression of this evidence harmed the Plaintiff by extending proceedings for 3.5 years.

188.

Defendants acted with intention or deliberate indifference to the Plaintiff's rights for the trust in suppressing the evidence.

189.

The violation of Plaintiff's constitutional rights caused damage to the Plaintiff.

190.

Defendants' conduct is the proximate cause to the damage suffered by the Plaintiff.

191.

Defendants acted with malice to deprive Plaintiff of his constitutional rights entitling Plaintiff to punitive damages.

## COUNT FOUR

### 42 U.S.C. § 1983 FOR DELIBERATE FABRICATION OF FALSE OR MISLEADING EVIDENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

192.

Plaintiff adopts by reference all prior and subsequent factual allegations of this Complaint.

193.

Defendants, for purposes of this Count are all law enforcement officers for the Watertown Police Department, Division of Criminal Investigations, and Forensic Scientists of the State of South Dakota, individually and not in their official capacity, deliberately fabricated false and intentionally misleading evidence that was used against the Plaintiff at grand jury and his jury trial.

194.

Defendants used language and lab reports that was both false and so misleading that they knew of were deliberately indifferent to the fact that these reports would be used to charge and prosecute the Plaintiff.

195.

Defendants suppressed facts that they were bound to disclose and instead gave information or facts with the intent to mislead the Plaintiff and the

jury constituting reckless indifference to Plaintiff's constitutional right to due process.

196.

The Defendants suggested, as a fact, information that was not true, by personnel who knew it was not true, or had reasonable ground to believe it was not true. Such conduct was intentional and reckless.

197.

The Defendants suppressed true facts when they were bound to disclose them and instead put forth reports in an attempt to mislead for want of communication of the true facts.

198.

The lab reports and police reports were false or misleading in material respects and were significant enough to affect the outcome of the proceeding and the decision-making process of prosecutors.

199.

The violation of Plaintiff's constitutional rights caused damage to the Plaintiff.

200.

Defendants knew that statements made in reports were false.

201.

Prosecutors relied on the false or misleading reports in the continuation of the prosecution.

202.

Defendants' conduct is the proximate cause to the damage suffered by the Plaintiff.

203.

Defendants acted with malice to deprive Plaintiff of his constitutional rights entitling Plaintiff to punitive damages.

**COUNT FIVE**

**42 U.S.C. § 1983 CLAIM AGAINST CODDINGTON COUNTY, AND THE CITY OF WATERTOWN FOR GOVERNMENT ENTITY LIABILITY AS A RESULT OF UNCONSTITUTIONAL POLICIES, PRACTICES AND CUSTOMS IN VIOLATION OF FOURTH, FIFTH, EIGHTH, FOURTEENTH AMENDMENTS.**

204.

Plaintiff adopts by reference all prior and subsequent paragraphs of this Complaint.

205.

The Defendants, City of Watertown, and County of Codington, which employed Defendants, is liable for violating Plaintiff's constitutional rights as set forth above.

206.

City of Watertown and County of Codington are liable to Plaintiff because they have unconstitutional official policies, or customs that caused Plaintiff's injuries.

207.

The unconstitutional policies or practice include, but are not limited to:

*Jeremiah Peacemaker v. Timothy Toomey et al*
*Complaint*
*Page 57 of 65*

A.   A policy, practice, and custom of failing to properly train the supervised investigative officers in the techniques of reliably investigating serious crimes;

B.   A policy, practice, and custom of failing to properly interrogate, properly document and properly follow up with witnesses and or potential suspects that have exculpatory evidence on behalf of the Plaintiff and other similarly situated suspects;

C.   A policy, practice, and custom of interviewing, investigating in such a manner that there was a great likelihood of obtaining false and unreliable information from suspects and witnesses;

D.   A policy, practice, and custom of suppressing, destroying or otherwise secreting exculpatory evidence from the defendant and limiting defense access to meaningful evidence;

E.   A policy, practice, and custom of failing to discipline officers who violate the constitution or laws or otherwise transgress the rights of criminal suspects during their investigation;

F.   A policy, practice, and custom of failing to adequately supervise law enforcement officers known by it to have falsely testified, known by it to have destroyed evidence; and

G.    A policy, practice, and custom of being deliberately indifferent to the violation by law enforcement officers of the rights of the accused.

208.

The named Defendants and agencies acted in a collaborative effort to adopt and perpetuate the unconstitutional policies, practices, and customs of each other.

209.

These interrelated policies, practices and customs, separately and together, were implemented intentionally to deprive possible targets of criminal investigations of their constitutional rights, or, at the very least were implemented with deliberate indifference to the rights of possible targets of criminal investigation and were a direct and proximate cause of the constitutional violations and injuries, set forth in this complaint.

210.

The violation of Plaintiff's constitutional rights caused damage to the Plaintiff.

211.

Defendants' conduct is the proximate cause to the damage suffered by the Plaintiff.

212.

Defendants acted with malice to deprive Plaintiff of his constitutional rights entitling Plaintiff to punitive damages.

## COUNT SIX

### 42 U.S.C. § 1983 FOR SUPERVISORY LIABILITY IN VIOLATION OF THE FOURTH, FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

213.

Plaintiff adopts by reference all prior and subsequent factual allegations of this Complaint.

214.

Plaintiff complains that all Defendants' supervisors, specifically unknown at this juncture, are liable in their supervisory capacity for violation of the Plaintiff's constitutional rights set forth above.

215.

Supervisory Defendants personally participated in the violation of the Plaintiff's constitutional rights, have a history of wide spread abuse of constitutional rights, intentionally implemented official policies or customs that resulted in their subordinates acting with deliberate indifference to Plaintiff's constitutional rights; or directed subordinate Defendants to take the actions that resulted in the violation of Plaintiff's constitutional rights; or knew that subordinate Defendants would take action in violation of Plaintiff's constitutional rights.

216.

The violation of Plaintiff's constitutional rights caused damage to the Plaintiff.

217.

Defendants' conduct is the proximate cause to the damage suffered by the Plaintiff.

218.

Defendants acted with malice to deprive Plaintiff of his constitutional rights entitling Plaintiff to punitive damages.

**COUNT SEVEN**

**42 U.S.C. § 1983 FOR CONSPIRACY IN VIOLATION OF THE FOURTH, FIFTH, EIGHTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

219.

Plaintiff adopts by reference all prior and subsequent factual allegations of this Complaint.

220.

Defendants, together and under the color of state law, reached an understanding, engaged in a course of conduct, and otherwise conspired between themselves to deprive Plaintiff of his constitutional rights, including his right to free association and familial privacy, to be free from unreasonable arrest and seizure, to be free from wrongful conviction and imprisonment, to be free from malicious prosecution, to get a fair trial and fair access to the courts, to due process of law, to counsel, to be free from cruel and unusual punishment and all basic rights of American citizens faced with criminal sanctions. The conspiracies deprived Plaintiff for rights protected by the first,

fourth, fifth, sixth, eighth and fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

### 221.

The conspiracy was intended to and had the effect of depriving Plaintiff of his right to association with his family, and to familial privacy, in violation of their rights under the first, ninth and fourteenth Amendments of the United State Constitution.

### 222.

The Defendants named in this count, together with un-sued co-conspirators, committed the overt acts set forth in the factual statements above. The overt acts included wrongful arrest, prosecution, conviction, imprisonment of the Plaintiff.  It also included the manufacture of knowingly false and knowingly unreliable evidence which was intended to inculpate Plaintiff; the suppression of exculpatory evidence, intentional failure to investigate evidence which would exculpate Plaintiff; and the filing of false, misleading, and unreliable reports as part of the investigation.  The conspiracy was designed to prove a case against Plaintiff despite his actual innocence which was or should have been known to Defendants.

### 223.

The violation of Plaintiff's constitutional rights caused damage to the Plaintiff.

224.

Defendants' conduct is the proximate cause to the damage suffered by the Plaintiff.

225.

Defendants acted with malice to deprive Plaintiff of his constitutional rights entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court will:

a.    Award compensatory damages to the Plaintiff, and against the defendants, jointly and severally, in an amount to be determined by the jury.

b.    Award punitive damages to Plaintiff, and against the Defendants, jointly and severally, in an amount to be determined by the jury.

c.    Award to Plaintiff his costs and attorney fees, pre-judgment and post-judgment interest, all other damages allowed by law, and such other and further relief the Court deems just and proper.

Respectfully submitted this 8th day of January, 2026.

BEARDSLEY JENSEN & LEE,
Prof. L.L.C.

BY:   /s/ *Steven C. Beardsley*
      Steven C. Beardsley
      Michael S. Beardsley
      Conor P. Casey
      4200 Beach Dr., Suite 3
      Rapid City, SD 57702
      Telephone: (605) 721-2800
      Facsimile: (605) 721-2801
      Emails: sbeards@blackhillslaw.com
      mbeardsley@blackhillslaw.com
      ccasey@blackhillslaw.com
      *Attorneys for Plaintiff*

      AUSTIN, STRAIT, BENSON
      THOLE & KOEHN LLP

BY:   /s/ *Kate M. Benson*
      Kate M. Benson
      Attorneys at Law
      25 First Avenue Southwest
      Watertown, SD  57201
      Telephone: (605) 886-5823
      Facsimile: (605) 653-1303
      Email: kate@austinlawsd.com
      *Attorneys for Plaintiff*

      BRATLAND LAW

BY:   /s/ *Scott R. Bratland*
      Scott R. Bratland
      Attorneys at Law
      15 1st Avenue Southeast
      Watertown, SD  57201
      Telephone: (605) 753-5957
      Facsimile: (605) 753-5958
      Email: Scott@Bratlandlaw.com
      *Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial of all his claims.

/s/ *Steven C. Beardsley*

Steven C. Beardsley

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JEREMIAH PEACEMAKER

**DEFENDANTS**

Timothy Toomey, et. al.

**(b)** County of Residence of First Listed Plaintiff  PENNINGTON
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Codington
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Steven Beardsley, Michael Beardsley, Conor Case, 4200 Beach Drive, Rapid City, SD 57702, 605-721-2800, Kate Benson, 25 First Ave., SW, Watertown, SD 57201, Scott [+]

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability / ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &   Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Slander   Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 330 Federal Employers'   Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | Liability / ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine   Injury Product | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 345 Marine Product   Liability | **LABOR** | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Liability / **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | |
| ☐ 195 Contract Product Liability | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | Product Liability / ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | ☐ 360 Other Personal   Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | Injury / ☐ 385 Property Damage | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury -   Product Liability | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| | Medical Malpractice | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities -   Employment / ☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities -   Other / **Other:** | **IMMIGRATION** | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____